**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ALEXIS GEIS, individually and on behalf of all others similarly situated, KARA LYNDON, and TIFFANY MORRIS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action |
| v. | ) | No. 17-12165-PBS |
| NESTLÉ WATERS NORTH AMERICA, INC. and SCOTT KELLY, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER**

July 2, 2018

Saris, C.J.

**INTRODUCTION**

Alexis Geis brings this class action against Nestlé Waters North America, Inc. ("NWNA"), alleging that NWNA failed to honor one-year agreements for lower prices on its products. In the First Amended Complaint (Docket No. 29) ("FAC"), Geis asserts four counts on behalf of a putative class: Count I (breach of contract); Count II (violation of Mass. Gen. Laws ch. 93A, § 11); Count III (fraud); and Count IV (violation of Mass. Gen. Laws ch. 93A, § 9). NWNA filed a motion to dismiss Counts I-IV (Docket No. 35), based on lack of personal jurisdiction, lack of subject-matter jurisdiction, and a failure to state claims upon

1

which relief can be granted.[1] After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** NWNA's motion to dismiss.

Geis has also moved to amend the FAC to add Bristol-Plymouth Moving and Storage, Inc. ("Bristol-Plymouth"), as another putative lead plaintiff for the class action. See Docket No. 34. The motion to amend is **ALLOWED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

The following factual background focuses on the allegations relevant to Counts I-IV and is taken from the FAC. The allegations must be taken as true at this stage. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014).

## I.   NWNA's Massachusetts Call Center

Geis is a resident of Florida, and NWNA is "a company with a place of business located at 375 Paramount Drive, No. 3, Raynham, Massachusetts." FAC ¶¶ 1, 4. Geis alleges that NWNA "conducts business in Massachusetts through its sale of product in this state and through the maintenance of a call center in this state." FAC ¶ 4. NWNA's business consists of selling and

---

[1]    The FAC also alleges that Kara Lyndon and Tiffany Morris were wrongfully terminated in violation of public policy by Defendants NWNA and Scott Kelly. Counts V and VI are breach of contract/wrongful termination claims on behalf of Lyndon and Morris. Defendants have not moved to dismiss these counts.

delivering bottled water, iced tea, coolers, and other items to individuals and businesses.

At its Raynham, Massachusetts, call center, NWNA employs a group of over 200 representatives who handle customer complaints about pricing. There is no pricing consistency among customers, so two customers may pay different prices for identical products. If a customer called to say she would be terminating her contract with NWNA, the call center representatives would try to "save" the customer. To "save" the account, the representative would lower the price that the complaining customer paid for a product. The price reductions negotiated by the representative and complaining customer would remain in effect for one year, and customers were informed of the one-year term over the phone. These one-year reductions were made pursuant to company policy. Call center representatives documented the agreements for one-year reductions in more than 50,000 "call notes."

## II.   **The Price Increase**

On or before January 1, 2016, NWNA "instituted a plan to raise all prices on its water products." FAC ¶ 31. This price increase was intended to apply to products under the one-year price reduction agreements, per NWNA Executive Vice President Henrik Jelert's instruction. Customers under these one-year agreements were not notified of the price increases. Jelert said

3

"we will see what happens," when discussing the possibility of customers under one-year agreements complaining about or even noticing price increases. FAC ¶ 35.

Nearly 50,000 customers with one-year agreements never complained and therefore paid the increased prices. When customers with one-year agreements did call to complain, the call center representatives would lie about the reason for the price increase, as they had been instructed to do by management. Then, the representatives would always honor the one-year agreement and fix the pricing to align with it. The proposed class is described as: "All [NWNA] customers who had been provided with a one year agreement as to pricing but as to which [NWNA] raised prices during that one year period." FAC ¶ 83. Total class damages exceed $20 million.

The FAC includes specific facts relating to a number of putative class members, but Geis's situation will serve as an example. Geis called NWNA on July 5, 2016 (after the policy to increase prices had been implemented), and a call center representative promised her that the price of her water cooler would be reduced to $1.99 each month for one year, and that each three-gallon water bottle would be $5.99 until December 17, 2017. This agreement is reflected in the call notes. On September 27, 2016, NWNA raised the price of the water cooler to $3.49. Then, on October 31, 2016, NWNA increased the price of

4

the three-gallon water bottle to $6.29. Geis paid the increased
prices because she did not know they had been raised. She "paid
a total of more than $100." FAC ¶ 46.

## III. **Bristol-Plymouth**

In their proposed Second Amended Complaint ("SAC"),
Plaintiffs seek to add Bristol-Plymouth, "a Massachusetts
Corporation with a place of business located at 105 Weaver
Street, Fall River, Massachusetts." Docket No. 34-1 ¶ 2.
Bristol-Plymouth called NWNA's Massachusetts call center on June
18, 2015, to complain about pricing. NWNA offered to reduce the
price by $5 for a period of one year, and Bristol-Plymouth
agreed to remain an NWNA customer. This agreement is
memorialized in the call notes.

On January 6, 2016, NWNA increased the price of Bristol-
Plymouth's coolers by $2. Bristol-Plymouth paid the increased
price "not realizing that it had occurred" and has lost more
than $50. Docket No. 34-1 ¶ 66.

## DISCUSSION

NWNA moved to dismiss Geis's FAC on three grounds: (1) lack
of personal jurisdiction; (2) lack of subject-matter
jurisdiction; and (3) failure to state a claim upon which relief
can be granted. The Court addresses NWNA's personal jurisdiction
arguments first, as they apply to all of Geis's putative class
action claims.

## I.  <u>Personal Jurisdiction</u>

### A.  Legal Standards

When a district court considers a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff must meet the prima facie standard for establishing personal jurisdiction over the defendant. See <u>A Corp. v. All Am. Plumbing</u>, 812 F.3d 54, 58 (1st Cir. 2016). The plaintiff bears the burden of demonstrating that the court may exercise personal jurisdiction in the case and "must put forward evidence of specific facts to demonstrate that jurisdiction exists." <u>Id.</u> (internal quotation marks and citation omitted). In reviewing the facts, courts "take the plaintiff's evidentiary proffers as true and construe them in the light most favorable to the plaintiff's claim." <u>C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.</u>, 771 F.3d 59, 65 (1st Cir. 2014). Courts also "consider uncontradicted facts proffered by the defendant." <u>Id.</u>

For "specific" or "case-linked jurisdiction" to apply, the suit must arise out of or relate "to the defendant's contacts with the <u>forum</u>." <u>Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.</u>, 137 S. Ct. 1773, 1780 (2017) ("<u>BMS</u>") (quoting <u>Daimler AG v. Bauman</u>, 571 U.S. 117, 127 (2014)).[2] Whether a court has personal jurisdiction over a defendant may

---

[2]    Geis does not argue that this Court has general personal jurisdiction over NWNA.

vary depending on the unique facts for each plaintiff. <u>See</u> <u>id.</u>
at 1781. To exercise specific jurisdiction over a defendant, the
district court must "find sufficient contacts between the
defendant and the forum to satisfy both that state's long-arm
statute and the Fourteenth Amendment's Due Process clause."
<u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1387 (1st Cir. 1995).

**B.   Analysis**

1.   <u>Massachusetts Long-Arm Statute</u>

The Massachusetts long-arm statute permits a court to
"exercise personal jurisdiction over a person, who acts directly
or by an agent, as to a cause of action in law or equity arising
from the person's . . . transacting any business in this
commonwealth." Mass. Gen. Laws ch. 223A, § 3(a). The definition
of "transacting any business" is construed broadly, and courts
look to whether the defendant attempted to participate in the
Commonwealth's economic life. <u>See</u> <u>Cossart v. United Excel Corp.</u>,
804 F.3d 13, 18 (1st Cir. 2015). The "arising from" inquiry
ultimately boils down to a "but for" causation test, which asks
whether "the defendant's contacts with the Commonwealth
constitute[d] 'the first step in a train of events that
result[ed] in the personal injury.'" <u>Lyle Richards Int'l, Ltd.</u>
<u>v. Ashworth, Inc.</u>, 132 F.3d 111, 114 (1st Cir. 1997) (quoting
<u>Tatro v. Manor Care, Inc.</u>, 625 N.E.2d 549, 553 (Mass. 1994)).

NWNA does not attack this Court's personal jurisdiction under the long-arm statute for good reason. Geis's complaint alleges facts that easily satisfy the long-arm statute's requirements. NWNA has a call center in Raynham where more than 200 employees worked. The call center handles approximately 50,000 calls per year. One purpose of the call center is to "save" customers who would otherwise terminate their water delivery agreements and to provide these customers with lower-priced contracts.

These allegations -- particularly the number of Massachusetts representatives employed by NWNA -- demonstrate that the company participated in economic life in the Commonwealth. See Cossart, 804 F.3d at 18-19 (finding "transacting any business" requirement met when company hired Massachusetts resident, employed him for a period of years, and registered a sales office in the state); Access Now, Inc. v. Otter Prods., LLC, 280 F. Supp. 3d 287, 291-92 (D. Mass. 2017) (finding company transacted business when it did two percent of its business in Massachusetts, employed field marketing representative in the state, and registered to do business in the state).

The "arising from" requirement, which is not a rigorous one, see Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 n.3 (1st Cir. 2016), is also met. The

allegations in the complaint make it clear that, but for NWNA's call center in Massachusetts and the one-year agreements the company negotiated from that call center, Geis would not have suffered an injury from the alleged breach of contract, fraud, or deceptive practices.

### 2. Due Process

For the Due Process Clause component of the personal jurisdiction analysis, the Court must decide:

> (1) whether the claim directly arises out of, or relates to, the defendant's forum state activities; (2) whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable.

Cossart, 804 F.3d at 20 (quoting C.W. Downer & Co., 771 F.3d at 65).

A claim that arises out of the forum activities is one in which there is "'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" BMS, 137 S.Ct. at 1780 (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). For purposeful availment, the "'key focal points' are the voluntariness of the defendants' relevant

Massachusetts contacts and the foreseeability of the defendants falling subject to Massachusetts's jurisdiction." Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 5 (1st Cir. 2016) (quoting Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007)). Finally, to determine the "reasonableness" of exercising personal jurisdiction, the Court looks to the "gestalt" factors: (1) the burden on the defendant, "(2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." Baskin-Robbins Franchising LLC, 825 F.3d at 40.

NWNA disputes this Court's specific personal jurisdiction under all three elements of the Due Process Clause test. The Court holds that it has specific jurisdiction over NWNA.

As a preliminary matter, the analysis of the "arising from" prong of the long-arm statute essentially addresses the analogous element under the Due Process Clause, as well. See id. at 34 (noting that long-arm statute and Due Process Clause requirements "are quite similar" with only a "modest difference").

Moreover, NWNA has purposefully availed itself of the privileges of doing business in Massachusetts. The company

10

voluntarily chose to set up its call center in Raynham and chose
to hire 200 employees to "save" customers with better pricing.
When NWNA allegedly instructed its call center employees to
enter approximately 50,000 new pricing contracts, it was
foreseeable that the company may have to answer for those
contracts in the state where they were negotiated. According to
Geis, the company also told the Massachusetts call center
representatives to lie to callers about one-year pricing terms.
Thus, the alleged fraud surged out from Massachusetts and
foreseeably brought NWNA into a Massachusetts court. These
allegations support a finding that NWNA's actions satisfy the
purposeful availment standard. See Carreras v. PMG Collins, LLC,
660 F.3d 549, 555 (1st Cir. 2011) ("[W]hen a defendant
deliberately targets its behavior toward the society or economy
of a particular forum, that forum should have the power to
subject the defendant to judgment regarding that behavior.").

NWNA argues that "[a] customer service call alone, by its
nature, cannot be used to establish specific personal
jurisdiction over NWNA in Massachusetts" or to satisfy the
"arising from" element of the due process analysis. Docket No.
36 at 11. The company relies on Northwest Airlines, Inc. v.
Astraea Aviation Services, Inc., 111 F.3d 1386 (8th Cir. 1997),
which stated that "[p]hone calls into a state are also a
relevant contact, although they also do not in themselves

11

establish jurisdiction." Id. at 1390. Geis may only have made one phone call to the Massachusetts call center, but the relevant contract was formed and the fraudulent misrepresentation was made during that phone call. Thus, the call was not a simple customer service call as NWNA argues.

The gestalt factors also come out in favor of personal jurisdiction. First, appearing in this Court would not be a burden for NWNA, a Delaware corporation with its principal place of business in Stamford, Connecticut, a state that borders Massachusetts. See Access Now, Inc., 280 F. Supp. 3d at 294 (noting that defendant "would have to demonstrate a special or unusual burden" and that cross-country travel for a large corporation does not typically meet that burden). Geis also asserts that discovery will focus on the call center and that "discovery outside of Massachusetts will be minimal." Docket No. 44 at 13. Second, Massachusetts has an interest in adjudicating consumer protection issues, even when those issues relate to an out-of-state plaintiff, because NWNA may be conducting business in an unfair or deceptive manner within its borders. To satisfy this factor, Massachusetts's interest need not be greater than the interest of any other jurisdiction. See Baskin-Robbins Franchising LLC, 825 F.3d at 40. Third, Geis's choice of forum should be given "some deference" by the Court. Id. at 41. The fourth factor (the judicial system's interest in obtaining the

most effective resolution of the controversy) is neutral in this case. See id.; Sawtelle, 70 F.3d at 1395. The fifth factor (the common interests of all sovereigns in promoting substantive social policies) also is neutral. Although Connecticut or Florida may have some interest in the adjudication of this action, any interest they have "does not trump Massachusetts'[s] interest." Baskin-Robbins Franchising LLC, 825 F.3d at 41.

## II.  Subject-Matter Jurisdiction

### A.  Legal Standards

Rule 12(b)(1) motions ask a court to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Article III standing may be challenged through a Rule 12(b)(1) motion to dismiss. See Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 36 (1st Cir. 2014). At all times, the party asserting jurisdiction bears the burden of proving that it has standing to sue. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). That burden at the pleading stage means "establishing sufficient factual matter to plausibly demonstrate . . . standing to bring the action." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016). "[C]onclusory assertions" and "unfounded speculation" are not enough to defeat a Rule 12(b)(1) motion. Id.

The "irreducible constitutional minimum of standing" has three elements: (1) injury in fact; (2) causation; and (3)

redressability. Lujan, 504 U.S. at 560-61. An injury in fact

must be both "concrete and particularized" and "actual or

imminent." Id. at 560 (internal quotations and citations

omitted).

## B.  Analysis

NWNA maintains that Geis lacks Article III standing to

pursue Count II and Count IV under chapter 93A because she has

never lived in Massachusetts, has not suffered an injury in the

state, and is not protected by its laws. NWNA relies on caselaw

holding that named plaintiffs do not have standing to bring

actions under the consumer protection statutes of different

states. See In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee

Litig., 1 F. Supp. 3d 34, 49 (E.D.N.Y. 2014) ("In this case, the

Court finds that the Plaintiffs may only assert a state claim if

a named plaintiff resides in, does business in, or has some

other connection to that state."); In re Checking Account

Overdraft Litig., 694 F. Supp. 2d 1302, 1325 (S.D. Fla. 2010)

("Plaintiffs may only assert a state statutory claim if a named

plaintiff resides in that state.").

Those cases involved multidistrict litigation, in which

checking account customers challenged banks' practices related

to overdraft fees. See In re HSBC BANK, 1 F. Supp. 3d at 39; In

re Checking Account Overdraft Litig., 694 F. Supp. 2d at 1306-

07. Because the plaintiffs claimed they were harmed by overdraft

charges, the courts held that they only had standing to bring claims under statutes of states where they lived and held checking accounts. See In re HSBC BANK, 1 F. Supp. 3d at 49; In re Checking Account Overdraft Litig., 694 F. Supp. 2d at 1325. But the type of consumer protection statute violation Geis asserts is very different: although she was physically located in Florida, her injury was allegedly caused by the fraudulent representation NWNA made from its Massachusetts call center.

The parties cite no cases that squarely deal with the standing issue under chapter 93A. On its face, chapter 93A does not require that a plaintiff reside in Massachusetts to bring a claim. See Mass. Gen. Laws ch. 93A, § 9(1) ("Any person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action."); id. § 11 (stating "[a]ny person who engages in the conduct of any trade or commerce" who has been injured may bring an action under that section); id. § 1(a) (defining "[p]erson" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity" without mention of Massachusetts residency). Moreover, to bring an action under § 9, there is no requirement that the allegedly deceptive activity had to occur "primarily and substantially" in Massachusetts. See Boos v. Abbot Labs., 925 F. Supp. 49, 55 (D.

Mass. 1996) (noting that, while § 11 includes the "primarily and substantially" requirement, § 9 does not). The Supreme Judicial Court ("SJC") has interpreted chapter 93A's private right of action to be broadly available to consumers. See Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 840 N.E.2d 526, 535 (Mass. 2006) ("Every consumer is, of course, entitled to the full protection of law. If any person invades a consumer's legally protected interests, and if that invasion causes the consumer a loss . . . the consumer is entitled to redress under our consumer protection statute.").

Finally, courts in this District and the Commonwealth have allowed chapter 93A suits by out-of-state plaintiffs to go forward, albeit without discussion of this particular standing issue. See Sharp v. Hylas Yachts, Inc., Civil No. 11-11814-JCB, 2015 WL 13656988, at *8, *13 (D. Mass. Jan. 14, 2015) (Nevada plaintiff); Suk Jae Chang v. Wozo LLC, Civil No. 11-10245-DJC, 2012 WL 1067643, at *11 (D. Mass. Mar. 28, 2012) (California plaintiff on behalf of putative class); Republic of Turkey v. OKS Partners, 797 F. Supp. 64, 68 (D. Mass. 1992) (international government plaintiff); see also Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 781 N.E.2d 787, 799-800 (Mass. 2003) (rejecting Kuwaiti corporation's chapter 93A claim on non-standing grounds). Based on these cases and the SJC's broad application of the statute, the Court declines to hold that

16

Massachusetts residents are the only consumers who can bring chapter 93A actions, particularly when a consumer is harmed by a fraudulent statement that was made in Massachusetts.

An injury under chapter 93A may be either economic or noneconomic. See Bellermann v. Fitchburg Gas & Elec. Light Co., 54 N.E.3d 1106, 1110 (Mass. 2016). To demonstrate a cognizable economic injury, a plaintiff only "must show real economic damages, as opposed to some speculative harm." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017) (internal quotations and citations omitted). A plaintiff's complaint must plead "objective, identifiable harm that goes beyond the [defendant's alleged] deception itself." Id. (internal quotations and citations omitted).[3] Here, Geis has claimed that she lost money as a result of the allegedly deceptive practices that arose from the Massachusetts call center. This is enough to allege an injury in fact for Article III standing purposes.

## III. **Failure to State a Claim**

### A.   **Legal Standard**

In evaluating a Rule 12(b)(6) motion, the Court must accept the factual allegations in the plaintiff's complaint as true, construe reasonable inferences in its favor, and "determine

---

[3]   Any class under chapter 93A, therefore, must be limited to only those who allegedly suffered a loss as a result of NWNA's actions.

whether the factual allegations in the plaintiff's complaint set forth 'a plausible claim upon which relief may be granted.'" Foley, 772 F.3d at 71 (quoting Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013)). To reach the threshold of plausibility, the allegations must be "more than merely possible." Schatz v. Repub. State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).

**B.   Analysis**

    1.   Breach of Contract (Count I)

NWNA asserts that Geis fails to state a claim for breach of contract because she does not append a contract to her FAC, does not "plausibly establish the existence of a valid oral agreement," and does not "properly allege the damages element." Docket No. 36 at 15–16. These arguments do not hold water.

First, Geis was not obligated to attach a written contract to her complaint, as the alleged oral agreement negotiated by the NWNA call center representative for lower water prices is the relevant contract. See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 864 N.E.2d 518, 534 n.40 (Mass. App. Ct. 2007) ("Oral contracts are as enforceable as written contracts so long as they are not barred by the Statute of Frauds.").

To adequately plead a breach of contract claim under Massachusetts law, a plaintiff need only allege "that there was

an agreement between the parties; the agreement was supported by
consideration; the plaintiff was ready, willing, and able to
perform his or her part of the contract; the defendant committed
a breach of the contract; and the plaintiff suffered harm as a
result." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass.
2016). Geis has alleged that, in return for her agreeing to
continue using NWNA as her water supplier, an NWNA call center
representative orally promised to reduce the price of her water
for one year. This agreement is memorialized in "call notes,"
according to Geis. She also alleges that NWNA breached that
agreement when it increased the prices just a few months later.
The FAC states that Geis paid the increased prices without
knowing and thus lost money as a result of the alleged breach.
Accordingly, Geis has pleaded all elements of a breach of
contract claim, including damages.

But NWNA also maintains that a written "Terms and
Conditions" document negates any alleged oral agreement that
Geis and the call center representative negotiated. The unsigned
"Terms and Conditions" document that NWNA has produced states
that "[t]he terms of this Agreement may be waived or amended
only in writing signed by Company and Customer." Docket No. 37-1
at 4.

On a Rule 12(b)(6) motion, "any consideration of documents
not attached to the complaint, or not expressly incorporated

therein, is forbidden." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). But courts have allowed "narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. Here, although NWNA has alleged that all customers sign the "Terms and Conditions" form, Geis argues that the actual document produced has not been signed by her or anyone else. As Geis appears to dispute the authenticity of the "Terms and Conditions," the Court is precluded from considering the document under Watterson.

Even if the Court were to consider the "Terms and Conditions" document, however, "a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract." Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass. 1992). Whether an oral modification occurred can "be inferred from the conduct of the parties and from the attendant circumstances" of the case. Id. (quoting First Pa. Mortg. Trust v. Dorchester Sav. Bank, 481 N.E.2d 1132, 1139 (Mass. 1985)). Overall, "[t]he evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties."

Id. at 1022 n.10. Geis has sufficiently alleged that an oral agreement or oral modification of the contract terms occurred. Thus, under Cambridgeport Savings Bank, the alleged existence of a completely integrated written agreement does not dispose of Geis's breach of contract claim at this stage of the litigation.

### 2.   Mass. Gen. Laws ch. 93A, § 11 (Count II)

NWNA also argues that Geis's claim under Mass. Gen. Laws ch. 93A, § 11 fails because she does not engage in trade or commerce and therefore does not have statutory standing. On this point, NWNA is correct.

Section 11 allows private causes of action under chapter 93A by "[a]ny person who engages in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 11. This section of the statute "governs commercial transactions between two parties acting in a business context." Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 682-83 (Mass. 2013) (internal quotations and citations omitted). There is no indication in the FAC that Geis was acting in a business context when she purchased her water from NWNA. The FAC states only that "Geis is an individual who resides at 8 Boston Lane, Palm Coast, Florida." FAC ¶ 1 (emphasis added). Because "section 11 affords no relief to consumers," Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000), Geis cannot bring a claim under this section.

### 3.    Fraud (Count III)

NWNA next argues that Geis does not meet Rule 9(b)'s particularity requirement for her fraud count and that the economic loss theory precludes a fraud claim. Neither argument justifies dismissal of Count III.

A common-law fraud claim requires a plaintiff to allege that (1) the defendant made a false representation of a material fact; (2) the defendant knew of its falsity when it was made; (3) the defendant made the statement with the purpose of inducing the plaintiff to act; (4) the plaintiff relied on the representation as true; and (5) the plaintiff acted upon the statement and suffered damages. See Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009). In addition, a plaintiff pleading fraud must do so with particularity. See Fed. R. Civ. P. 9(b). Rule 9(b) requires that the plaintiff "specify the who, what, where, and when of the allegedly false or fraudulent representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

The timeline alleged in Geis's complaint makes it clear that she has satisfied the pleading rules. By January 6, 2016, the pricing increase had been implemented for all customers, including those subject to one-year agreements. However, on July 5, 2016, the call center representative told Geis that her lower prices would be in effect for one year, as all representatives

22

did at the direction of company managers. Thus, according to Geis, at the time the representation was made about the one-year term, NWNA knew that statement was false. Geis has also alleged that the offer of lower prices for one year was made to "save" customers from terminating their business with NWNA. Finally, she alleges that she paid the increased prices "because she did not know that they had occurred" and paid more than $100. FAC ¶¶ 45-46. Geis has pleaded all the elements of a common-law fraud claim and has cited the content and date of the alleged false representation.

Geis has also claimed that the alleged false statement was made over the phone by an NWNA agent who worked at the Raynham call center. In some cases, the First Circuit has required a plaintiff to specify the name of the person who made the allegedly fraudulent misrepresentation. See Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) (rejecting alleged statements made by an "employee" and "an admissions officer" under Rule 9(b) because each was "made by an unidentified person at an unnamed place and at an unspecified time"). Instead of giving an individual's name, Geis has alleged that promising one-year pricing terms was a company-wide policy followed by all call center representatives, and that a representative did in fact promise her a one-year term on the day she called. The Court will not dismiss the fraud claim for

Geis's failure to include a specific name, as the allegations in the FAC satisfy the purposes of Rule 9(b). See Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (stating goals of Rule 9(b) are "to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery").[4]

### 4. Mass. Gen. Laws ch. 93A, § 9 (Count IV)

A claim under § 9 "requires, at a minimum, a showing of (1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 169 (Mass. App. Ct. 2009). An act is unfair or deceptive if it is "'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'" Cummings v. HPG Int'l, Inc., 244 F.3d 16, 25

---

[4]   NWNA also briefly advances an argument based on economic loss theory, which is neither well developed nor clear to the Court. And regardless, NWNA does not cite any Massachusetts or federal court cases to support the assertion that the economic loss theory precludes a fraud claim based in breach of contract. See Docket No. 36 at 18 (citing only an unpublished Connecticut superior court case and a Florida appellate court case). The Court need not wade further into these waters.

(1st Cir. 2001) (quoting <u>PMP Assocs., Inc. v. Globe Newspaper Co.</u>, 321 N.E.2d 915, 917 (Mass. 1975)).

NWNA asserts that Geis included a "sole conclusory allegation" for her § 9 claim, Docket No. 36 at 19, but that is unfounded. Geis specifically incorporates paragraphs 1 through 131 of her FAC in Count IV, which include the allegations of false representations about the one-year agreements. She also alleges that she suffered an injury as a result of the false representation that her lower pricing contract would be in effect for one year. Moreover, the Court has already found that Geis has successfully pleaded common-law fraud, which can serve as the basis of a chapter 93A claim. <u>McEvoy Travel Bureau, Inc. v. Norton Co.</u>, 563 N.E.2d 188, 194-95 (Mass. 1990). Accordingly, the FAC includes allegations related to all three elements of a § 9 claim.

NWNA's final argument is that the chapter 93A claim is "another recast of a simple billing dispute" and must be dismissed. Docket No. 36 at 19. NWNA is correct that a mere breach of contract is not an unfair or deceptive act or practice. <u>See</u> <u>Woods</u>, 733 F.3d at 358 (stating that "the facts must illustrate something beyond a mere good faith dispute, failure to pay, or simple breach of contract"); <u>Callahan v. Harvest Bd. Int'l, Inc.</u>, 138 F. Supp. 2d 147, 166 (D. Mass. 2001) ("A breach of contract, without more, does not violate

chapter 93A."). But here, Geis has alleged more: that there was a false representation about the one-year agreements, and also that upper management knew that it was breaching one-year agreements with customers and was trying to sneak the breach past them. These are the types of unfair and deceptive acts at which chapter 93A is targeted. See Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991) ("[C]onduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice." (quoting Wang Labs., Inc. v. Business Incentives, Inc., 501 N.E.2d 1163, 1165 (Mass. 1986))).

For these reasons, Geis may pursue her claim under Mass. Gen. Laws ch. 93A, § 9.

## IV.   **Motion to Amend**

### A.   **Legal Standard**

Courts "should freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, courts may deny leave to amend for several reasons, including "futility of amendment." United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009). If a plaintiff seeks leave to amend a complaint prior to the close of discovery, courts apply the motion to dismiss standard of Fed. R. Civ. P. 12(b)(6) to decide whether amendment would be futile. Hatch v. Dep't for

<u>Children, Youth & Their Families</u>, 274 F.3d 12, 19 (1st Cir. 2001).

**B.   Analysis**

For the same reasons outlined above with respect to Geis, Bristol-Plymouth has pleaded a valid breach of contract claim in the SAC. The motion to amend is therefore allowed with respect to that claim.

The SAC also states a claim under § 11 of chapter 93A. To decide whether § 11 applies, courts must analyze, first, "whether the interaction is 'commercial' in nature" and, second, "whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'" <u>Linkage Corp. v. Trustees of Bos. Univ.</u>, 679 N.E.2d 191, 206 (Mass. 1997). Plaintiffs allege that Bristol-Plymouth purchased products from NWNA since 2014, which is sufficient to establish that the transaction between them was "commercial" in nature. <u>See id.</u> at 207 (holding that "arm's-length transaction between two corporations" met commercial transaction requirement of § 11). Based on the SAC's allegations, both Bristol-Plymouth and NWNA, two corporations, were also engaged in trade or commerce in their dealings with each other. <u>See id.</u> (listing "business context" factors from <u>Begelfer v. Najarian</u>, 409 N.E.2d 167, 190-91 (Mass. 1980)).

Plaintiffs successfully allege an unfair or deceptive act or practice, as well. The SAC states that NWNA's upper management was attempting to sneak its breach of contract past Bristol-Plymouth when it covertly raised water prices on January 6, 2016. These allegations go beyond a simple breach of contract and suggest NWNA's "disregard of known contractual arrangements" that was "intended to secure benefits for the breaching party." Anthony's Pier Four, Inc., 583 N.E.2d at 821 (internal quotations and citations omitted). The motion to amend is allowed on the § 11 claim.

Allowing Bristol-Plymouth's fraud claim to go forward would be futile, however, because the allegations specific to Bristol-Plymouth do not establish that NWNA knowingly made a false representation when it entered the one-year agreement. See Taylor, 576 F.3d at 31 (stating that knowledge of statement's falsity is required element of common-law fraud). The SAC alleges that Bristol-Plymouth entered its one-year agreement on June 18, 2015. However, according to the SAC, NWNA instituted the plan to raise all prices on water after that conversation -- "[o]n or before January 1, 2016." Docket No. 34-1 ¶ 32. Moreover, the SAC alleges that NWNA did not violate any one-year pricing agreements before January 2016, and that "[o]nly after January 2016 did [NWNA] intentionally breach the agreements." Docket No. 34-1 ¶¶ 81-82. Accordingly, there is no indication

that NWNA's call center representatives would have been aware of the future price increase when they spoke to Bristol-Plymouth six months before it occurred. The fraud claim is therefore futile.

### ORDER

The motion to dismiss (Docket No. 35) is **ALLOWED**, with respect to the claim for violation of Mass. Gen. Laws ch. 93A, § 11 (Count II), and is **DENIED** in all other respects. NWNA's motion to dismiss Counts I-III of Plaintiffs' original complaint (Docket No. 25) is **DENIED** as moot.

The motion for leave to amend (Docket No. 34) is **ALLOWED**, with respect to the claims for breach of contract (Count I) and for violation of Mass. Gen. Laws ch. 93A, § 11 (Count II), and is **DENIED**, with respect to the fraud claim (Count III).


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge